**In re Kent Francis EDWARDS, dba Hobby Horse Ranch Tractor & Equipment, Debtor.**

**State of Idaho, Plaintiff,**

v.

**Kent Francis Edwards, Defendant.**

**Bankruptcy No. 98–00394. Adversary No. 98–6125.**

United States Bankruptcy Court, D. Idaho.

April 5, 1999.

Brett T. DeLange and Brian D. Nicholas, Office of the Attorney General, Boise, Idaho, for plaintiff.

D. Blair Clark, Ringert, Clark, Boise, Idaho and R. Keith Roark, Hailey, Idaho, for defendant.

## MEMORANDUM OF DECISION

JIM D. PAPPAS, Chief Judge.

### I. Background.

In this adversary proceeding, the State of Idaho asks the Court to find that Defendant Kent Edwards d/b/a Hobby Horse Ranch Tractor & Equipment ("Hobby Horse"), a Chapter 11 debtor, has violated the Idaho Consumer Protection Act ("ICPA") and Idaho Rules of Consumer Protection ("RCP") in the conducting his business activities. On behalf of several of Defendant's customers, the State seeks an award of money damages. The State also asks that civil penalties be imposed against Defendant. See Idaho Code § 48–606. Finally, the State requests a determination by the Court that any damages awarded or penalties imposed are excepted from discharge by Defendant in his bankruptcy case under 11 U.S.C. §§ 523(a)(2)(A) and (a)(7).

Following a trial involving several of the State's and customers' claims, which concluded on January 29, 1999, the matter was taken under advisement.[1] The parties have fully briefed and argued their respective positions. After a careful review of the evidence, testimony and the arguments of the parties, this Memorandum constitutes the Court's findings of fact and conclusions of law. F.R.B.P. 7052.

### II. Facts.

Defendant Kent Edwards ("Edwards") is the sole owner of Hobby Horse, a business he started over ten years ago. Hobby Horse sells, among other items, small tractors. It advertises products through-

---

1. The State asserts claims against Defendant arising from his dealings with about 40 different customers. Counsel stipulated, and the Court concurred, that a trial be held with respect to a limited number of those claims, and that the Court render a preliminary deci-sion. Since most of the transactions involve similar issues of fact and law, the parties and Court hoped that this procedure may expedite resolution of the remaining claims against Defendant.

out the western United States in "Little Nickel" type newspapers and through the use of brochures. Some of the tractors it sells and that appear in Hobby Horse's advertisements are so-called "gray market" tractors. These are tractors that were manufactured in a foreign country (usually Japan and China) and were intended by the manufacturer to be sold and used within those countries, not within the United States. The tractors in question were in fact originally sold and used in the foreign markets. They become gray market tractors when they are later imported as used tractors for resale within the United States. It appears that when this occurs, the used tractors can be imported and sold in the United States at prices which are significantly lower than the prices for a used tractor specifically manufactured for, and originally purchased in, this country.

The major tractor manufacturers also build similar models of tractors intended to be sold new and used in the United States. There are usually several substantial differences between tractors manufactured for resale in Asia as compared to those made for sale in the United States. According to one knowledgeable witness who testified during the trial, gray market tractors frequently do not come equipped with roll bars; they do not have a "PTO shield," a device which covers certain moving parts on the tractor to prevent injury; their instructional and warning labels are, understandably, not printed in English; they may lack certain warning or tail lamps; the hand throttle operates in the opposite fashion as compared to a U.S. tractor; they usually lack a PTO-clutch, another safety device which prevents unintended forward movement during braking; and their tires and wheels are designed for uses not usually encountered in America, another safety concern. Many of these differences may not be readily apparent to, nor the significance of the differences appreciated by, an unsophisticated buyer.

In the early 1990's, Edwards became aware of the availability of imported gray market tractors while reading a trade magazine. Edwards contacted Gamut Trading ("Gamut") in San Francisco, California to inquire about purchasing some of these tractors. Edwards was told about a dealer in Montana that stocked and sold the gray market tractors. Edwards went to Montana, viewed the tractors and talked with the dealer. He purchased a tractor and took it to Hobby Horse's place of business in Jerome. Once there, Edwards equipped the tractor with a Power King loader attachment, a brand of implement manufactured by Hobby Horse. The tractor was later sold to a customer in Oregon via an advertisement in a local paper.

With the sale, Edwards became very enthused about the prospects of selling gray market tractors. He visited Gamut, which had since moved to Simi Valley, California, and inquired about purchasing gray market tractors. Gamut offered Edwards a dealership. Gamut representatives explained to Edwards that the tractors they intended to sell Hobby Horse were all sold new in Japan, used there in the rice production industry, and then imported to the United States for sale through Gamut's dealership network. Edwards purchased several tractors during this initial visit to resell at Hobby Horse.

When a tractor was purchased by Edwards and arrived at Hobby Horse in Jerome, Edwards and his staff would inspect the tractor to determine repairs that were necessary to prepare the tractor for retail sale. Edwards also directed his employees to grind off all serial numbers on the tractors. The tractors were also fitted with loaders and other accessories prior to sale.

Edwards appreciated that an extremely important factor in marketing gray market tractor to Hobby Horse customers would be the availability of replacement parts for those tractors. Gamut employees informed Edwards that replacement parts for a gray market tractor could either be obtained from an experienced parts person

working for companies selling comparable American brand tractors (i.e. tractors built by the same manufacturer and imported new and sold in the United States). He was also told that replacement parts could be obtained through LBL Equipment in California, a company with a source for parts in Japan.

In 1995, Edwards' son, Brent Edwards, joined Hobby Horse as the parts and service manager. To that point, Kent Edwards had obtained over 90% of the parts needed for the Hinomoto tractors he had sold from LBL Equipment. Identifying and locating replacement parts for gray market tractors could, at times, be a very difficult process. However, Brent became experienced in researching and determining the compatibility of replacement parts for American tractors and gray market tractors. He became successful in obtaining parts from several different sources, primarily from Agri–Service, a tractor dealership in Burley. In order to do so, however, and with much effort, Brent had to compile his own conversion charts matching gray market tractor parts to those sold for American tractors that would be compatible.

In this phase of this action, the parties have focused upon sales of gray market tractors by Edwards to four of Hobby Horse's customers. The customers involved are Richard Houghton ("Houghton"), Tim Gillam ("Gillam"), Alex Ritter ("Ritter"), and Duncan and Angela Miller ("Millers"). A summary of their dealings with Edwards and Hobby Horse follows.

Houghton is a landscape contractor in Anacortes, Washington. In 1994, he began looking to acquire a tractor, preferably a Kubota brand, for use in his business. Houghton saw a newsprint ad in the Northwest edition of the Little Nickel placed there by Hobby Horse dated September 15, 1994. Houghton was interested in one of the Kubota tractors in the ad, phoned Hobby Horse and discussed the details concerning the tractor in question with Kent Edwards. The tractor price was to be approximately $10,390 including delivery. Edwards told Houghton that in order to purchase the tractor, Houghton would need to immediately send Edwards a cash deposit of $1,000. Houghton agreed to the deal, and wired the deposit to Edwards via Western Union. After sending the deposit, Houghton then received an invoice for the remainder of the balance due. He obtained financing through Wells Fargo Bank and sent Edwards a cashier's check for the balance due. Sometime in late October 1994, Edwards had the tractor delivered to Houghton's home in Washington.

Initially, Houghton was surprised at the appearance of his tractor as compared to the Kubota tractors he had operated in the past. The tractor was smaller, shaped differently, and was a different color than expected. Houghton began using his tractor the day it arrived. As he attempted to pick up a bucket of dirt, the entire loader assembly attached to the tractor shifted and twisted, damaging the tractor. He immediately phoned Kent Edwards and asked for a refund of his money. Edwards refused to refund the money and instead sent Houghton two hydraulic rams to assist in repairing the loader. Houghton eventually spent approximately $1,600 to repair the loader assembly so that it would operate properly.

Not only did Houghton experience problems with the loader, the roto-tilling attachment did not function properly. Houghton claims Edwards told him on the phone prior to the sale that the tractor had a 20 horsepower engine, when in fact, it had an approximate 12 horsepower engine. Houghton testified that he was surprised when, after receiving the tractor, he learned it was not a Kubota tractor, but rather a gray market tractor manufactured for original sale and use in another country. Houghton testified that because of this, it was difficult to obtain replacement parts to repair the tractor. Houghton used the tractor about five times in the year he owned it and eventually sold it for

$5,500, which sale also included a trailer worth approximately $800. Houghton feels Edwards misled him and that had Houghton known he was not purchasing a true Kubota tractor, he would not have purchased the tractor from Hobby Horse.

Tim Gillam is a "hobby farmer" from Arlington, Washington. His home includes five acres of ground and Gillam needed a small tractor to help maintain his property. Gillam first became interested in purchasing a tractor from Hobby Horse in fall 1994 when he saw an ad in the "Little Nickel." He phoned Edwards to find out more about a tractor described in the ad as a 26 horsepower Kubota. Edwards sent Gillam a photo of the tractor and told him it was a Kubota "model L265." Based upon this understanding, Gillam purchased the tractor in November 1994 for $14,390 including delivery.

Gillam has used the tractor for over four years in his garden, to clean his barn, and to remove debris from his property. When Gillam's tractor first needed repairs, he learned from a local Kubota representative that there was no such thing as a Kubota model L265. The Kubota parts dealer refused to sell him the parts he needed, indicating that Kubota and its dealers had liability concerns with using Kubota parts to repair gray market tractors. Gillam requested replacement parts from Brent Edwards. He was sent parts manufactured for use in a Kubota model L245. The L245 parts were installed on the tractor which Gillam continues to operate to this day on his small farm.

Alex Ritter is a part-owner of ARESCO, a company that manufactures equipment used in mining and heavy construction operations throughout the world. Ritter also owns an eight-acre farm in Coeur d'Alene, Idaho. While looking for a small tractor to use on his property, Ritter spotted a Hobby Horse ad in his local newspaper. He called Hobby Horse and told Kent Edwards that he wanted a 30 horsepower tractor. Edwards told Ritter that he had such a tractor, a Hinomoto brand. Edwards told Ritter that the tractor was essentially the same as a Deutz Allis–Chalmers and sent Ritter pictures of the different models available. Edwards indicated to Ritter that the tractor had been used in agriculture in northern California and that the tractor had "low hours" of usage. Ritter expressed particular concern about obtaining replacement parts for the used tractor. Edwards told Ritter that replacement parts were "readily available." Ritter purchased the tractor for $15,795 including delivery and the tractor was delivered to him in February of 1994.

When Ritter inspected the tractor, he found that all the instruction and informational labels on the machine were in Japanese. He discovered by talking to various manufacturers that he had purchased a gray market tractor. When Ritter thereafter needed and attempted to locate replacement parts for his tractor, he experienced great difficulty. With his experience in the industry, after considerable effort and investigation, he was eventually able to secure a parts manual for an Allis–Chalmers model 5230 tractor, matching the one that was on the picture he had received from Hobby Horse. However, replacement parts for an Allis–Chalmers model 5230 did not match those needed for his Hinomoto tractor. Although Ritter has continued to use his tractor, he considers it worthless due to the extreme difficulty in finding repair and replacement parts.

Duncan and Angela Miller own a construction company in Spring Creek, near Elko, Nevada. Mr. Miller learned about Hobby Horse through an ad in the local newspaper. When he first contacted Hobby Horse by phone, Mr. Miller was interested in a Yanmar brand tractor. Kent Edwards informed Miller that the Yanmar model shown in the ad had been sold, but that he had a similar tractor in stock, a 1991 Massey–Ferguson. Edwards requested a $2,000 cash deposit to hold the tractor, which Miller sent Edwards. After securing financing to purchase the tractor,

Mr. and Mrs. Miller drove to Hobby Horse's lot in Jerome to look at the tractor. While there, Mrs. Miller questioned Edwards specifically about the tractor's warranty and the availability of parts in the Elko area, because she knew there was no Massey–Ferguson dealer in their area. Edwards told the Millers there was no warranty on the tractor. However, he told them that parts manufactured for a Rhino tractor could be used to repair the tractor they wanted; that there was a Rhino dealer in the Elko area; and that if need be, replacement parts could be obtained from Hobby Horse. Mrs. Miller had serious concerns about buying the tractor. However, once the Millers learned from Edwards that their cash deposit was non-refundable, they decided to buy the tractor rather than lose the $2,000 deposit. Millers paid $16,350 for the tractor, which included delivery.

Miller's first problem with their tractor concerned certain "sway buckle arms" which were missing from the tractor. These parts keep implements and attachments steady while the tractor is in use. Mrs. Miller contacted Hobby Horse to see if sway buckles could be obtained. She was told by Kent Edwards that Brent Edwards would check with Agri–Service to see if the buckles could be obtained. When Kent Edwards called Mrs. Miller back, he told her that the buckles were too expensive and that some welding could possibly take care of the problem. Mrs. Miller was upset with Edwards' approach to the problem, the conversation deteriorated, and she hung up the phone on Edwards. Mrs. Miller, remembering Kent Edwards' statement that Rhino parts were interchangeable with parts from the tractor that they were purchasing, contacted the Rhino tractor dealer in Elko, Great Basin Agricultural ("Great Basin"). A dealer representative told her that Rhino buckles would not work on her tractor.

After using the tractor for approximately 20 hours, Millers' tractor experienced serious engine trouble and broke down.

Mrs. Miller again contacted Great Basin to inquire about parts necessary to fix the tractor. Again, she was told Rhino parts would not work. She then contacted Massey–Ferguson dealers in Idaho, Utah, and Nevada hoping to find parts. Since the Millers did not have a serial number on the tractor, as all serial numbers had been ground off at Hobby Horse, the Massey–Ferguson dealers could not help her. Millers discovered that they did not in fact have a Massey–Ferguson tractor but rather a gray market tractor. Finally, Mrs. Miller called Hobby Horse and explained to Kent Edwards the difficulty she had experienced in trying to obtain parts. Edwards told her that Hobby Horse ordered its parts from Agri–Service and suggested that she call there and talk to Gary Martin, which she promptly did. Martin told her that he could not get her a part without a cross reference part number from Hobby Horse.

Frustrated, Millers loaded up their tractor and drove to Jerome to see if they could either get their money back from Edwards or get another tractor. Kent Edwards told Mr. Miller that he would fix the tractor and could get the necessary parts for the job. However, Millers were unwilling to allow Edwards to make the repairs, and they returned to Nevada with their disabled tractor. They took the tractor to Roadside Service Automotive ("Roadside"), an Elko tractor repair service.

Roadside tore down the tractor and determined that the engine had experienced a broken crank and a cracked block. Once Roadside determined what parts would be needed to fix the tractor, Mrs. Miller called Hobby Horse to see if the parts were available. Kent Edwards informed Mrs. Miller that the parts could in fact be ordered, but that she would have to pay for the parts before Hobby Horse would order them. Miller thought the quoted price for the parts was excessive, and she once again hung up on Edwards.

Mrs. Miller next went to Great Basin and talked with the owner, Tony Lesperance, about the possibility of Great Basin ordering the parts from Agri–Service. Mr. Lesperance agreed to help. He was able to order a new short block at a savings to the Millers of over $800 compared to the cost of ordering the parts from Hobby Horse. The short block was installed by Roadside, but since new cylinder heads could not be located for the engine, the old heads were put back in the tractor. The new short block also came with a new clutch; however, the replacement clutch would not fit the tractor and the old clutch was reinstalled. The new clutch as well as a crank, seal, and bearings were returned unused to Great Basin.

In the process of trying to locate the required replacement parts, Mr. Lesperance discovered that production of the engine on Millers' tractor had been discontinued in the early 1980's. Mr. Lesperance warned Millers that it was just a matter of time before they would need to replace the clutch. The prediction was prophetic, since the clutch soon failed. Millers obtained a new clutch, but in order for the new clutch to work properly, it had to be installed backwards.

A month later, the four-wheel drive on the tractor failed. Mr. Miller pulled the axle out and had his wife take it to Mentaberry Trucking in Elko, a company specializing in four-wheel drive repair. They could not repair the tractor. According to their best estimates, the axle and splines parts were dated to a period of time between 1971 and 1975. Unable to fix the four-wheel drive, Millers continued to use the tractor as a two-wheel drive.

Finally, in May 1997 the tractor again experienced engine problems and Millers took the tractor to Great Basin. The original cylinder head that had been put on the new short block had malfunctioned, and the engine was ruined. The new short block, believed to be under warranty, needed to be replaced. Unfortunately, the warranty was void since the repair shop had used the old cylinder heads. The tractor has not been repaired and is not currently in operation.

### III. Discussion.

**A. Did Defendant Violate the Idaho Consumer Protection Act and Regulations in His Dealings with the Customers?**

In seeking an award of damages and penalties from Edwards, the State relies upon provisions of the ICPA and RCP. The statutory provisions cited by the State include, in relevant part, Idaho Code § 48–603:

> The following unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared to be unlawful, where a person knows, or in the exercise of due care should know, that he has in the past, or is:
>
> ***
>
> (4) Using deceptive representations or designations of geographic origin in connection with goods or services;
>
> (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, connection, qualifications or license that he does not have;
>
> (6) Representing that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used, or secondhand;
>
> (7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;
>
> (9) Advertising goods or services with intent not to sell them as advertised;
>
> (14) Making false or misleading statements of fact concerning the age, extent of use, or mileage of any goods;

(17) Engaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer;

Plaintiff also cites relevant provisions from RCP:

1) It is an unfair and deceptive act or practice for a seller to make any claim or representation concerning goods or services which directly, or by implication, has the capacity, tendency, or effect of deceiving or misleading a consumer acting reasonably under the circumstances. An omission of a material or relevant fact shall be treated with the same effect as a false, misleading, or deceptive claim or representation, when such omission, on the basis of what has been stated or implied, would have the capacity, tendency, or effect of deceiving or misleading a consumer acting reasonably under the circumstances. With reference to goods or services, this prohibition includes, but is not limited to, factors relating to the cost, construction, durability, reliability, manner or time of performance, safety, strength, condition, life expectancy, ease of operation, problems associated with repair or maintenance, availability, or the benefit to be derived from the use of the goods or services. IDAPA § 04.02.01.30.

2) It is an unfair and deceptive act or practice for a seller to represent, directly or indirectly, that goods are new or unused, or that any part of a good is new or unused, if such is not in fact true, or to misrepresent the extent of previous use of goods. IDAPA § 04.02.01.110.

3) It is an unfair and deceptive act or practice for a seller to advertise, offer for sale, or sell any goods, as new goods, which are used, or contain used parts, are rebuilt, remanufactured, reconditioned, or contain rebuilt, remanufactured, or reconditioned parts, if such is not in fact true, unless clear and conspicuous disclosure of such characteristics or attributes is made to the consumer prior to the sale. There is a rebuttable presumption that a seller offers or advertises goods as new goods, unless clear and conspicuous disclosure to the contrary is provided. IDAPA § 04.02.01.111.

The ICPA is remedial legislation intended to deter unfair and deceptive trade·practices and is to be construed liberally. *Western Acceptance Corporation, Inc. v. Jones (In re Western Acceptance Corporation, Inc.)*, 117 Idaho 399, 788 P.2d 214, 216 (1990). "An act or practice is unfair if it is shown to possess a tendency or capacity to deceive consumers." *Kidwell v. Master Distributors, Inc.*, 101 Idaho 447, 615 P.2d 116, 122 (1980). It is not necessary to prove actual intent to deceive or actual deception on behalf of the defendant as long as a tendency or capacity to mislead consumers has been established. *Id.* at 122–23.

Under the ICPA, the State can seek the following remedies: (1) prohibition of the offensive conduct or practices through imposition of a temporary restraining order, preliminary injunction, or a permanent injunction, Idaho Code § 48–606(1)(b); (2) civil penalties of up to $5,000 for each violation of the ICPA, Idaho Code § 48–606(1)(e); and (3) recovery of reasonable attorney fees and costs incurred by the State in investigating and prosecuting an enforcement action, Idaho Code § 48–606(1)(f). The State need not show actual damage to the public to establish a trade practice as unfair or deceptive. *Master Distributors* 615 P.2d at 123.

The State can also recover actual damages or restitution on behalf of a consumer. Idaho Code § 48–606(1)(c). In addition, a person who has suffered an ascertainable loss of money or property through· the purchase of goods as a result of a violation of the ICPA, may treat the transaction "as voidable or, in the alternative, may bring an action to recover actual damages or one thousand dollars ($1,000), whichever is greater ... [or] may also

seek restitution...." Idaho Code § 48–608(1). Under this provision, the consumer is required to show ascertainable loss in order to recover or treat the transaction as voidable. *Jackson v. Wood,* 124 Idaho 342, 859 P.2d 378, 380.

Given this statutory and decisional framework, the Court has reviewed the facts in this case. As a result of this analysis, the Court concludes that Edwards is guilty of numerous violations of the ICPA and applicable regulations in his dealings with the customers identified above. The Court will discuss its findings and conclusions with respect to each of the claimants.

1. Houghton.

The ad placed by Hobby House in the Northwestern Little Nickel offers for sale "KUBOTA 4 × 4 diesel farm or landscaping tractors, 20, 23 & 26 HP...." Plaintiff's Exhibit 28. This description, upon which Houghton relied in making his purchase from Edwards, does not include any reference to Hinomoto, the actual brand of the tractor sold. Interestingly, in the same edition of the Little Nickel, Hobby House also advertised several "John Deere (Yanmar)" tractors for sale. In doing so, by the addition of the "Yanmar" brand in parenthesis, the customer is arguably alerted to the fact that the tractors were perhaps different from the usual John Deere brand manufactured specifically for sale within the United States.

Houghton read the ad, and was interested in buying a Kubota tractor. When he called Hobby Horse, he did not ask Edwards if the advertised tractor was a "gray market" tractor or question whether it was in fact a Kubota, as he had no reason to suspect otherwise. In this respect, the Court finds that the ad was deceptive in its representation of the tractor Hobby House intended to sell. Idaho Code § 48–603(7) and (17); IDAPA § 04.02.01.30.

After Houghton sent his deposit money to Edwards to "hold" the tractor, he received a "retail order" from Hobby House. This document described the tractor as a "(USED) KUBOTA FARM–LANDSCAPEING [sic] TRACTOR...." Plaintiff's Exhibit 27. Edward's description of the tractor in this document is deceptive in that it did not alert Houghton to the fact that he was actually buying a Hinomoto, not a Kubota, tractor. Idaho Code § 48–603(5), (6), (7), (9), and (17); IDAPA § 04.02.01.30.

In addition, Edwards failed to disclose to his customer an important fact: that the tractor he was selling Houghton was manufactured in Asia for the Asian market, not for sale in the United States. Instead, Houghton was told his tractor came from California where it had been used in agriculture. While this statement is technically true, this approach, without an explanation of the true history of the tractor, amounts to deception. Since Edwards knew exactly where the tractors originated, and should know that this information was important to his customers in making an informed decision whether to purchase the tractor, it was a deceptive practice to withhold this information from the customer. Idaho Code § 48–603(4) and (17); IDAPA § 04.02.01.30.

Not only did the ad in the Little Nickel represent that the tractors offered by Hobby House for sale were Kubotas, it also represented that their engines generated 20 to 26 horsepower. Houghton testified that he indicated to Edwards his desire to purchase a 20 horsepower tractor. When he received and began using the tractor, Houghton thought, based upon his experience in operating 20 horsepower Kubota tractors, that the tractor and hydraulics were unusually slow.

The Court heard the testimony offered by the State of Mr. Colin Fulford, a former safety and quality control director for Kubota Tractor Corporation. Mr. Fulford examined the tractor formerly owned by Houghton. During his examination of the tractor, Fulford was able to locate a serial number on the engine, and based on the

model of the engine and Fulford's experience and familiarity with that engine, Fulford estimated it to be 12.5 horsepower. While Edwards argues that horsepower is computed differently in the Asian market, the Court finds that, under these circumstances, the horsepower of Houghton's tractor was misrepresented to him. Idaho Code § 48–603(7) and (17); IDAPA § 04.02.01.30.

Finally, Houghton's retail order describes the loader attachment as a "NEW FRONT HYD LOADER WITH DOWN PRESSURE FOR DIGGING...." On the first day Houghton received the tractor, he attempted to use the loader to move a small dirt pile. As Houghton started to tilt the bucket back with the dirt in it, the entire loader assembly twisted, causing severe damage to the assembly. Edwards had manufactured and installed the loader assembly in Jerome. Edwards did not tell Houghton that the loader assembly was not Kubota brand, but instead Hobby Horse's Power King brand. Houghton testified that he was under the impression that the new loader was a Kubota brand. This too was deceptive conduct. Idaho Code § 48–603(6), (7), and (17); IDAPA § 04.02.01.30, § 04.02.01.110, and § 04.02.01.111.

In sum, the Court finds that Edwards violated the ICPA in numerous respects in connection with the tractor sale to Houghton. In the exercise of the Court's discretion, the Court concludes that Edwards' conduct is sufficiently offensive so as to justify imposition of the maximum $5,000 civil penalty for his dealings with Houghton.

Houghton incurred $1,686 to repair the loader assembly which twisted on the first day the tractor was used. Houghton's loss is directly related to Edwards' deception and unfair practices which have been determined to be in violation of the ICPA. Edwards argues that the loader problems were caused by Houghton's misuse. However, on this record, it appears that Houghton was using the loader precisely in the manner that Edwards indicated both orally and in writing it could be operated.

Houghton purchased the tractor for $10,390 and sold it one year later for $5,500. While Houghton was able to put the tractor to some good use, the Court is convinced that he suffered a loss on resale of the tractor. On this record, the Court finds that the difference in the depreciated value of this tractor, or $5,690 ($10,390 – ($5,500 – $800)), is attributable to the fact that the tractor was not a Kubota but rather a gray market tractor. Houghton testified that he would not have purchased the tractor had he known it was not a Kubota brand tractor. Houghton therefore has damages amounting to $7,376 ($1,686 + $5,690), which may be recovered under Idaho Code Section 48–608(1). In the alternative, Houghton may choose to void the purchase transaction. Since Houghton has subsequently sold the tractor, should he elect to void the transaction, Hobby Horse, in refunding Houghton's $10,390 purchase price, would be allowed to offset the sale proceeds of $5,500, less the $800 value of the trailer, for a total refund of $5,690.

2. Gillam.

Mr. Gillam, like Mr. Houghton, wanted to purchase a Kubota tractor. He had seen the Hobby Horse ads in the Little Nickel many times and had phoned Edwards on a prior occasion to inquire about purchasing a Kubota tractor. During that call, Edwards informed Gillam that he did not have the particular tractor Gillam wanted. Gillam instructed Edwards to inform him when one became available and that he would then be interested in purchasing the tractor. Eventually, Edwards contacted Gillam to let him know that a tractor was available and sent him photographs of the various tractors that were up for sale. Gillam finally settled on a 26 horsepower Kubota and sent Edwards a deposit to hold the tractor. Gillam received a retail order from Hobby Horse

describing his tractor as a "L265 D.T. (USED) KUBOTA. . . ." Plaintiff's Exhibit 18. The document also informed Gillam that all deposits were non-refundable, something Gillam did not know prior to sending his deposit. Clearly, informing Gillam that the deposit was non-refundable only after it was made was misleading and deceptive. Idaho Code § 48–603(17); IDAPA § 04.02.01.30.

When he received it, not only was Gillam's tractor not a Kubota, but as it turns out, there was no such model "L265." Edwards testified that he invented the model number. Transcript of Trial, Day 2, at 171. Edwards further testified that he was aware that Gillam was "adamant" about purchasing only a Kubota brand tractor. *Id.* at 169. A short time after Gillam purchased his tractor, while working on a small incline, the tractor stalled on two wheels almost rolling over. This incident prompted Gillam to inquire at the nearest Kubota dealer about the installation of a roll bar. The dealer informed him that his tractor was a gray market tractor and that the dealer would not sell him parts. Gillam was told that there was no such thing as a Kubota model L265 tractor. Gillam testified that had he known these facts at the time of purchase that he would not have purchased the tractor. With Edwards' knowledge of Gillam's desire to purchase a Kubota brand tractor, and knowing that the tractor he was about to sell Gillam was not a Kubota, Edwards intentionally misled and deceived Gillam by assuring him orally and in writing that the tractor was a Kubota L265. Idaho Code § 48–603(5), (6), (7), (9), and (17); IDAPA § 04.02.01.30.

Gillam was also concerned at the time of purchase about the availability of parts for his used tractor. Since he lived in a remote location, he planned on doing many of the repairs himself. Gillam testified that he "specifically asked about parts availability . . . [and] was told parts would be available for the tractor." Transcript of Trial, Day 1, at p. 68. While Edwards

suggests otherwise, the Court finds that implicit in Edwards' representation is the notion that Gillam would be able to obtain parts at Kubota dealers near his home. What Edwards testifies he meant was that his business, Hobby Horse, should be able to "mix and match" different parts to fit the tractor. Edwards assumed that replacement parts would always be available with the help of Brent Edwards. However, Gillam was not told that Hobby Horse may in fact be the only realistic source for replacement parts or, as Edwards acknowledges, that Brent Edwards was one of only a few individuals in the country that could cross reference parts for gray market tractors.

In addition, when Gillam did order parts from Hobby Horse to replace an axle on his tractor, he was sent a replacement part that was over an inch longer than appropriate, the part having been manufactured for use in a Kubota model L245. Gillam installed the axle, but appreciates the uncertain implications of using non-conforming parts. This particular incident also illustrates the difficulty that even Hobby Horse had in obtaining the correct parts for Gillam's tractor (whatever actual model it may have been).

■ Again, the Court finds that Edwards directed several serious misrepresentations to Gillam as to the identity of the tractor he was purchasing, and the availability of replacement parts. Idaho Code § 48–603(4), (7), (9), (17); IDAPA § 04.02.01.30. Viewing the transaction and events as a whole, the Court in its discretion finds that Edwards committed multiple violations of the ICPA in his dealings with Gillam, and that the appropriate civil penalty is $5,000.

Gillam has not experienced problems with his tractor that would be uncharacteristic for a used tractor, although he has been forced to use parts that do not exactly fit his tractor, such as the mismatched axle. Gillam testified that he would not have purchased the tractor had he known the true identity of it. Gillam has suffered

an ascertainable loss equal to the difference in value between the tractor he bought and the value of the tractor he thought he was buying. The Court finds that because of the extreme difficulty in obtaining parts and service on the tractor, and the fact that Gillam still is not sure of the exact identity of his tractor, that Gillam's tractor is essentially worthless. Thus, the damages equal the purchase price paid by Gillam of $14,390. However, since Gillam has been able to use his tractor for over four years and may continue to use his tractor in the future, his damages should be limited to 50% of the purchase price. This amount, $7,195, is recoverable by Gillam under Idaho Code Section 48–608(1), or in the alternative, Gillam may elect to void the sales contract. Should Gillam so elect, he will be required to return the tractor to Hobby Horse, with all implements purchased from Hobby Horse in return for a refund of $10,792.50, which is the original purchase price of $14,390, less a 25% discount for the past use of the tractor.

3. Alex Ritter.

Mr. Ritter contacted Hobby Horse and spoke with Kent Edwards about purchasing a 30 horsepower tractor. Edwards told Ritter that he had a Hinomoto tractor and, more importantly, he told him it was the same thing as a Deutz Allis–Chalmers. Ritter inquired about the availability of parts. Edwards responded that parts could be obtained from Hobby Horse or any Allis–Chalmers dealer. Ritter then purchased the tractor.

During the first summer that Ritter used the tractor, it developed "a leak on the front end of one of the planetary drives for the wheels." Transcript of Trial, Day 1, at p. 218. Ritter began searching for parts to fix the leak. Since his tractor had no serial number he had to look at pictures of Allis–Chalmers tractors to try to determine what model he had purchased. He believed his tractor most resembled an Allis–Chalmers 5230. After a lengthy search through the Allis–Chalmers organization, Ritter finally found someone who knew something about Hinomoto tractors. That person sent Ritter copies of pages from a Hinomoto service manual and provided him with cross reference numbers for Massey–Ferguson parts. Ritter was able to use this information to obtain replacement parts for his tractor.

The Court finds that Ritter was deceived and misled by Edwards' assurances that parts were readily available through local dealers and that the tractor was "the same as" a Deutz Allis–Chalmers. Idaho Code § 48–603(5), (6), (7), (9), and (17); IDAPA § 04.02.01.30. In fact, from the record it appears that parts were not, and are not, readily available. Evidence of this is Ritter's efforts involving hours on the phone tracking down an elusive service manual and converting parts numbers to match available parts. While Ritter, who had considerable experience in parts and equipment, was able to accomplish this feat, Edwards' conduct is nonetheless misleading, deceptive, and intentionally false.

Edwards also represented to Ritter that the tractor he was about to purchase was a "low hour" tractor with approximately 340 hours. When Ritter received the tractor it had over 1,000 hours. Edwards further told Ritter that the tractor had been used in agricultural operations within the United States. As it turns out, both representations, concerning the hour usage and the origin of the tractor, were false, potentially and actually misleading, and created a misunderstanding in Ritter's mind concerning the condition and history of the tractor he was about to purchase. Idaho Code § 48–603(4), (6), (7), (9) and (17); IDAPA § 04.02.01.30 and § 04.02.01.110.

Finally, the State asserts Ritter was deceived by Edwards with respect to the $1,600 deposit sent to Hobby Horse to hold the tractor. Ritter was not advised that his deposit was non-refundable until he received the retail order requesting payment of the balance due and giving a description of the tractor. Edwards' practice

in this regard was misleading and deceptive to consumers. Idaho Code § 48–603(17); IDAPA 04.02.01.30.

■ Once again, based upon all the facts, the Court finds that Edwards engaged in deceptive practices in his transaction with Ritter, for which violations of the ICPA a $5,000 penalty should be imposed.

Similar to Gillam, Ritter has been able to use his tractor for over five years relatively trouble free. With Ritter's expertise in parts and equipment, he has been able to find parts and make necessary repairs. However, Ritter was deceived by Edwards with respect to the true identity of the tractor, the availability of parts, the hour usage of the tractor, and with respect to the refundability of his deposit. Ritter asserts that the tractor has no value. The appropriate measure of damages is the amount Ritter paid for the tractor, or $15,795. However, since Ritter has been able to use the tractor on his property for several years and the tractor is still in operation, the amount of damages should appropriately be reduced by 50%, to $7,897.50. Under Idaho Code Section 48–608, Ritter is entitled to recover $7,897.50 or, in the alternative, to void the purchase contract with Hobby Horse. If Ritter elects to void the contract, the tractor along with all applicable implements that were purchased from Hobby Horse will be returned Hobby Horse in exchange for a refund of 75% of the purchase price, $11,846.25, will be remitted to Ritter.

### 4. Duncan and Angela Miller.

The first deceptive representation made by Kent Edwards to Millers concerned the brand of tractor they were to purchase. Mr. Miller called Hobby Horse and was sent a brochure showing some of the tractors that Hobby Horse was offering for sale. Originally, Miller expressed interest in a Yanmar brand tractor. However, Edwards informed Miller that the Yanmar tractor had already been sold. Edwards explained that he had a similar tractor that was a Massey–Ferguson, which Miller could buy at the same price as the Yanmar. In addition, Edwards told Miller the Massey–Ferguson came equipped with more implements than did the Yanmar. Miller informed Edwards that he was interested but would need to discuss the purchase with his wife. Upon hearing this, Edwards warned Miller that there were others interested in the tractor and that in order to hold it Miller would need to send a cash deposit as soon as possible.

That same day, Millers discussed the purchase of the tractor and Mr. Miller called Edwards back to make a $2,000 deposit through use of his credit card. Miller recalled that in this subsequent conversation, Edwards referred to the tractor as a Massey–Hinomoto. However, the addition of the Hinomoto name to the Massey brand did not alert Miller that he was buying a gray market tractor. In fact, Millers were sold a Hinomoto tractor, and Edwards' representation that the tractor sold to Millers was a Massey–Ferguson, or even that it was a Massey–Hinomoto, was misleading and deceptive. Idaho Code § 48–603(5), (6), (7), (9), and (17); IDAPA § 04.02.01.30. Further, Edwards' representation in contract documents that their $2,000 deposit was non-refundable, after payment was made, was deceptive and very well may have been a factor in Millers following through with the purchase of the tractor. Idaho Code § 48–603(17); IDAPA § 04.02.01.30.

Mrs. Miller was specifically concerned about the availability of parts for the tractor. When Millers traveled to Jerome to look at the tractor prior to paying the balance due, Mrs. Miller questioned Kent Edwards about the tractor's warranty. She was told that there was no warranty. With that, she inquired about buying parts given the fact that there was no Massey–Ferguson dealer in the Elko area. Edwards told Millers that Rhino parts could be used. Since there was a Rhino dealer in the Elko area, Millers' concerns were pacified. In truth, Rhino parts could not in many cases be used interchangeably

with Hinomoto parts, and replacement parts were not readily available for Millers' tractor. Edwards' statements to the Millers concerning the availability of parts were misleading and false. Idaho Code § 48–603(17); IDAPA § 04.02.01.30.

Millers were also told that they were buying a 1991 tractor. They later found out, from mechanics working on the tractor, that the tractor was probably manufactured sometime between 1971 and 1975. Edwards presented evidence indicating that a similar Massey–Ferguson model was manufactured from 1979 to 1984. In any event, the tractor was not a 1991 model, Edwards had no good basis for calling it a 1991, and his representation indicating so was false and misleading. Idaho Code § 48–603(7), (9), and (17); IDAPA § 04.02.01.30.

■ As with the other customers, the Court finds Edwards' transaction with Millers was premised upon several material misrepresentations made by Edwards concerning the tractor. This conduct constitutes a violation of the ICPA, for which a $5,000 penalty should be imposed.

Millers suffered the most severe damage of any of the claimants. The damages incurred were a direct result of Edwards' unfair and deceptive practices, which have been found to violate the ICPA. The record shows Millers incurred approximately $5,941 in repairing the tractor. Millers used the tractor only sparingly and it is no longer in operation. Millers would not have purchased the tractor in the absence of the deceptive practices of Edwards. Millers should be able to recover a significant portion, amounting to 75% of the repair costs incurred, or $4,455.75, from Edwards. In addition, the Miller sales contract shall be deemed rescinded. Edwards may reclaim the tractor and all implements and will be required to refund the entire purchase price of the tractor to Millers amounting to $16,350. Therefore, Millers' damages amount to $20,805.75 ($4,455.75 + $16,-350) and are recoverable under Idaho

Code Section 48–608(1). Under that provision, Millers could instead elect to only void the contract in which instance Edwards would be required to refund the $16,350 purchase price upon return of the tractor to Hobby Horse.

In the case of all four claimants, the State is also entitled to recover restitution on behalf of the victims in connection with Edwards' violations of the ICPA. Idaho Code 48–606(1)(c). Restitution is an equitable remedy intended to restore a person to the position he or she occupied prior to the injury. Black's Law Dictionary 1313 (6th ed.1990). However, since the claimants have been able to recover all damages under Idaho Code Section 48–608, imposing an award of restitution under Section 48–606(1)(c) would create double recovery for the claimants.

5. Injunction.

■ The State has also sought a permanent injunction to prevent Edwards from engaging in similar unfair and deceptive practices in the future. The Court finds this entirely appropriate. Upon conclusion of this action, the State may propose an appropriate form of injunction for entry by the Court.

B. Are the penalties imposed by the Court against Edwards under the IPCA excepted from discharge in bankruptcy?

1. Section 523(a)(7).

Bankruptcy Code Section 523(a)(7) creates an exception from discharge "to the extent [a] debt is for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss...." 11 U.S.C. § 523(a)(7); *Mabey v. Ellis, Thurber, and Jack*, 224 B.R. 786, 788 (Bankr.D.Idaho 1998). The issue presented here is whether the ICPA civil penalties imposed by the Court upon Edwards above fall within this exception.

In this case, Idaho Code § 48–606(e) provides for the imposition of up to a $5,000 penalty for each violation of the ICPA. This penalty is recoverable by the Attorney General on behalf of the State. Idaho Code Section 48–606(f)(5) explains that the "penalties, costs and fees recovered by the attorney general shall be remitted to the consumer protection account ... and shall be used for the furtherance of the attorney general's duties and activities under [the ICPA]." The statute thus makes it clear that ICPA penalties are paid to the State of Idaho, are used for the benefit of the State, and are not directly related to any actual pecuniary loss of the claimants. Thus, the penalties imposed upon Edwards for ICPA violations are excepted from discharge in bankruptcy under Bankruptcy Code Section 523(a)(7).

2. Section 523(a)(2)(A).

Section 523(a)(2)(A) excepts from discharge any debt incurred through "false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). To invoke the protections of this provision, a creditor must prove, by preponderance of the evidence, *see Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), that: (1) Defendant made representations; (2) which at the time Defendant know were false; (3) Defendant made the representations with the intention of deceiving Plaintiff; (4) Plaintiff relied on such representations, and; (5) Plaintiff sustained the alleged loss as the proximate result of the representations. *American Express v. Hashemi (In re Hashemi)*, 104 F.3d 1122, 1125 (9th Cir.1996), cert. denied 520 U.S. 1230, 117 S.Ct. 1824, 137 L.Ed.2d 1031 (1997). Furthermore, under Section 523(a)(2)(A) there is a duty to disclose material facts and information when the other party is ignorant of, and could not have discovered, such facts. *Apte v. Japra*, 96 F.3d 1319, 1324 (9th Cir.1996). Those elements are satisfied on this record.

Kent Edwards made repeated and significant false representations to the claimants in this proceeding. In addition, in several instances, he failed to disclose certain material information about his tractors, without which, his customers were lead to make incorrect, albeit reasonable, assumptions about the product they were purchasing. Having already found that the misrepresentations were misleading, false, and deceptive for purposes of imposing penalties under the ICPA, the Court concludes the representations are likewise false for purposes of Section 523(a)(2)(A).

Edwards told Houghton that he was buying a Kubota tractor and that the tractor had a 20 horsepower engine. These representations were false. In addition, Edwards failed to disclose the history of the tractor, instead leading his customer to believe the tractor had only been used for agriculture in California. He also failed to inform his customer that Hobby Horse was the manufacturer of the front loader assembly, leading Houghton to believe something else. Keeping this information from Houghton amounted to false representations about the tractor.

Edwards told Gillam that: (1) Gillam was purchasing a Kubota model L265 tractor; and (2) that parts could easily be obtained from his local Kubota dealer. Both representations were false. Edwards testified that he knew Gillam desired to purchase only a Kubota brand tractor. At the same time, Edwards knew that the tractor he was selling was not in fact a Kubota tractor. Further, Edwards knew that Kubota dealers had been instructed by the parent company not to sell Kubota parts to owners of gray market tractors and that Gillam could not in fact buy parts at his local Kubota dealer.

Edwards represented to Ritter that: (1) the tractor he was purchasing was the same as a Deutz Allis–Chalmers; (2) the tractor had low hour usage with approximately 340 hours; and (3) parts could be readily obtained from his local Allis–Chal-

mers dealer. The representations were false. Edwards knew the representations were false.

Finally, Edwards represented to the Millers that: (1) they were purchasing a Massey–Ferguson or Massey–Hinomoto tractor; (2) parts would be available in the Elko area from the local Rhino dealer and that those Rhino parts were interchangeable with parts for their tractor; and (3) they were buying a 1991 tractor. The representations were clearly false. Edwards knew that the tractor was not a Massey–Ferguson and that parts were not readily available for the Millers' tractor. Edwards also knew or should have known that the tractor was not a 1991, but rather an older tractor.

Edwards representations concerning the purchase deposit in each case also amounted to misrepresentations. In each case, he encouraged his customer to make a cash deposit to "hold" their tractor. He then followed up each deposit with paperwork indicating that the balance of the purchase price was due, and that their deposits were non-refundable. While Edwards insists he would have been willing to refund the deposit had he been asked at that point, his approach amounts to misrepresentation, something which the Court can only conclude was an intentional ploy to tie his customers to a sale.

The representations to each claimant and Edwards' repeated failure to disclose the true facts are the type of false representations contemplated by Section 523(a)(2)(A). Moreover, in each instance, the Court finds the representations were false, and that Edwards knew, or had ample cause to believe, that such were false.

The Court finds and concludes that Edwards intended to deceive his customers. Intent to deceive is a question of fact which may be inferred from the surrounding circumstances of the case. *Cow-*

*en v. Kennedy (In re Kennedy)*, 108 F.3d 1015, 1018 (9th Cir.1997). Here, the record indicates that Edwards knew critical facts concerning the tractors he sold, such as the brand, origin, and prior usage of the tractors. He knew that the availability of replacement parts for the tractors he was selling could, and in many cases would, be limited. Edwards repeatedly "invented" important facts about the tractors sold to the claimants, referring to the tractors by the name of a recognized manufacturer his customers would know, and assigning model numbers that did not exist. These were used tractors, and Edwards knew he had no continuing warranty obligations to his customers nor even any reason to deal with them further. In some cases, if his customers wanted parts, Edwards knew they were practically required to deal with his business.

Edwards also instructed that all serial numbers on the gray market tractors be removed by his employees. Such an act is extremely difficult to explain, since the evidence shows that lack of serial numbers is the most common method of identifying the true make and model of a tractor, in parts and components. It also greatly complicated Edwards' customers efforts to obtain parts. Moreover, it is an act that is, at least, contrary to public policy in Idaho.[2] While Edwards testified that he removed serial numbers to avoid confusing his customers, the Court doubts his sincerity in this regard, and suspects his motives were less than honorable.

The circumstances speak loudly that Edwards was intent on taking advantage of the fact that he was dealing in low-priced tractors which, without knowing more, his customers would innocently and incorrectly view as a bargain when measured against the cost of domestic tractors. The Court finds that Edwards' conscious decision to withhold important information or

---

2. Idaho Code § 49–231 provides that "any person who knowingly ... sells ... any tractor ... from which the manufacturer's serial or engine number ... has been removed, defaced, covered, altered, or destroyed for the purpose of concealing or misrepresenting the identity of the tractor ... is guilty of a felony."

to falsely represent the facts adequately establishes Edwards' specific intent to deceive the claimants.

The United States Supreme Court has construed the terms of Section 523(a)(2)(A) to require justifiable, not reasonable, reliance. *Field v. Mans*, 516 U.S. 59, 70–71, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). The Court instructs "that justifiable reliance is the standard applicable to a victim's conduct in cases of alleged misrepresentation and that 'it is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own.'" *Id.* at 71, 116 S.Ct. 437 (quoting W. Prosser, Law of Torts § 108, p. 718 (4th ed.1971)).

Edwards attempts to argue that, largely based upon the low price of the tractor being purchased, each of the claimants should have exercised more caution in making their purchases. The Court disagrees. For example, Edwards' customers could certainly rely upon Edwards' representation as a merchant concerning the brand of tractor that was being purchased. None of them had any reason to suspect that they were buying another brand of tractor. Even when the word Hinomoto was added to Massey in the case of the Millers, there was no reason for Millers to suspect that the tractor was not a Massey–Ferguson. In this age, companies frequently merge with names being added and changed.

The claimants were also justified in relying upon Edwards' representations that replacement parts were readily available; statements concerning the origin of the tractors, their history, and age; and the hour usage of the tractors. None of the claimants, including Mr. Ritter who had specialized knowledge of some heavy equipment and parts, had the requisite knowledge of the essential facts to be able to question any of the representations made by Edwards.

Moreover, each of the four claimants suffered a monetary loss as a result of the Edwards' tactics, as outlined above. Each suffered loss as a direct result of reliance upon Edwards' many false representations and omissions. Under Section 523(a)(2)(A), not only are the damages caused by fraud nondischargeable but also other costs and damages flowing from the fraud. *Cohen v. De La Cruz*, 523 U.S. 213, 118 S.Ct. 1212, 1218, 140 L.Ed.2d 341 (1998).

Houghton sustained losses including $1,686 to repair the twisted loader assembly and $5,690, upon selling the tractor for a total loss of $7,376. This amount, or $5,690 if Houghton elects to void the contract, is nondischargeable under Section 523(a)(2)(A) in Edwards' bankruptcy case.

The damages sustained by Gillam, amounting to $7,195, or $10,792.50 if he elects to void the contract, will be excepted from Edwards' bankruptcy discharge under Section 523(a)(2)(A).

Ritter's damages of $7,897.50, or $11,846.25 if he elects to void the contract, will be nondischargeable under Section 523(a)(2)(A) in Edwards' bankruptcy case.

Finally, the Millers sustained damages of $20,805.75 ($4,455.75 + $16,350), or $16,350 should Millers elect to void the contract. The damages are excepted from Edwards' discharge under Section 523(a)(2)(A) of the Bankruptcy Court.

## IV. Conclusion.

The State of Idaho, on behalf of the four designated claimants, has established clear violations of the ICPA by Kent Edwards. Civil penalties of $5,000 will be imposed for each of the four transactions discussed above. The total civil penalty of $20,000 will be nondischargeable under Section 523(a)(7).

Edwards engaged in unfair and deceptive practices in connection with selling

these four claimants tractors. For this, the claimants will be awarded damages of $7,376 for Houghton, $7,195 for Gillam, $7,897.50 for Ritter, and $20,805.75 for Millers. Should the claimants elect to void the contract under Idaho Code Section 48–608(1), the respective damages would be $5,690 for Houghton, $10,792.50 for Gillam, $11,846.25 for Ritter, and $16,350 for Millers.

Edwards' conduct towards these customers was fraudulent. He made false representations and withheld important information from each of them. All claimants relied to their detriment. Damages flowing from these misrepresentations and reliance thereon are excepted from discharge under Section 523(a)(2)(A) in the amounts awarded under the ICPA.

The transactions discussed above amount to only a small number of the total which the State asserts the Court should review. Whether other claimants have been the victim of ICPA violations or fraudulent conduct can only be determined after an examination of the facts of each individual transaction. Therefore, the Court will reserve ruling on any and all other issues, and the action will be scheduled for further trial after consultation with the parties.